# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. MARTARIOUS HOSKINS[1]

### Appeal from the Criminal Court for Shelby County
### No. 10-00014    W. Mark Ward, Judge

---

### No. W2010-02618-CCA-R3-CD  - Filed November 7, 2011

---

The defendant, Martarious Hoskins, appeals from his Shelby County Criminal Court jury convictions of aggravated robbery, arguing that the evidence was insufficient to support his convictions. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Harry Sayle III, Assistant Public Defender, Memphis, Tennessee (on appeal); and Amy Mayne, Assistant District Public Defender (at trial), for the appellant, Martarious Hoskins.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Robert Ratton, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant's convictions relate to the armed robbery of Toni and Willie Ghoston on July 27, 2009. At trial, Willie Ghoston testified that at the time of the offenses, he and his wife, Toni Ghoston, owned and operated Servine and Shine Janitorial Cleaning. On July 27, 2009, the pair were cleaning Premier Daycare when Mr. Ghoston heard Mrs. Ghoston scream. Mr. Ghoston explained that he had propped open a door to ventilate the

---

[1]The defendant testified at trial that his name is "Martavious" rather than "Martarious." No attempt was made to amend the indictment, which contains the incorrect spelling. As is the policy of this court, we utilize the spelling contained in the indictment.

room where they were stripping and waxing the floors. Three men entered through the open door armed with handguns. Mr. Ghoston recalled that the man he later identified as the defendant "was tying something around his face." Mr. Ghoston said that he told Mrs. Ghoston not to look at the men and to "give them what they want." He stated that one of the men held a gun to his head while a second held a gun to Mrs. Ghoston's head. The third man demanded money from both victims. After the victims gave the assailants all their money, the three men left the daycare facility, dropping a dime onto the floor in the process.

Mr. Ghoston testified that after the perpetrators left, he and Mrs. Ghoston closed and locked the doors and then telephoned 9-1-1. He said that the robbers took his wallet, which contained $47.00 and his credit cards. They also took his keys. Mr. Ghoston said the men took $100 from his wife along with her cosmetics case. Mr. Ghoston testified that the entire incident was captured by the surveillance cameras in the daycare facility.

Mr. and Mrs. Ghoston went to the police station two days later to examine a photographic array created by the police. Mr. Ghoston testified that he and Mrs. Ghoston were separated immediately upon their entry into the police station and placed in separate rooms to view the photographs. Mr. Ghoston identified the defendant as one of the perpetrators, saying that he remembered the defendant because of "his dreads and his funny looking eyes." Mr. Ghoston did not identify anyone from a second array shown to him by detectives. He later identified the defendant again at the preliminary hearing and at trial.

Toni Ghoston testified and confirmed her husband's version of the offenses, adding that she put her head down when Mr. Ghoston told her not to look at the perpetrators. Before putting her head down, however, Mrs. Ghoston saw each of the perpetrators for a brief period of time. She identified the defendant as one of the perpetrators. She, too, identified the defendant from the first photographic array shown to her by police.

Memphis Police Department ("MPD") Officer Arthur C. Webb responded to the call at Premier Daycare on July 27, 2009. Officer Webb testified that he and other officers checked inside the building and grounds for the perpetrators but discovered no one. They then went looking for individuals matching the descriptions provided by the victims but did not find them in any of the areas they checked.

MPD Lieutenant Kenzie White, the lead investigator into the robbery of the Ghostons, testified that he examined the surveillance video from the night of the offenses. Later, after searching for the perpetrators proved fruitless, he released a portion of the video to the media and asked for any information about the robbery. He said that several calls came in to the "Crime Stoppers" line about the robbery. Based on the information provided to Crime Stoppers, Lieutenant White focused on the defendant, whose nickname was "Tay-

Tay," as a suspect along with Jamon Ueal and Edward White. Lieutenant White then created photographic arrays for each of the three suspects. Lieutenant White testified that both Mr. and Mrs. Ghoston identified Edward White and the defendant as participants in the offenses. Only Mrs. Ghoston identified Jamon Ueal as one of the perpetrators.

Following his arrest, the defendant signed a waiver of his rights after a *Miranda* warning and agreed to be interviewed by the lieutenant. Lieutenant White recalled that the defendant denied any involvement in the offenses and implicated Edward White, Jamon Ueal, and a third individual known as "Spiderman." Lieutenant White said that "Spiderman" was actually Demarcus Jack. Based upon this information, Lieutenant White prepared a photographic array containing Mr. Jack's photograph and showed it to the victims. Neither victim identified Mr. Jack as a participant in the robberies. Lieutenant White also interviewed Mr. Jack, who denied any knowledge of the offenses. Lieutenant White conceded that some Crime Stoppers tips that came in after the defendant's arrest implicated "Spiderman" in the robberies.

During cross-examination, Lieutenant White testified that Jamon Ueal admitted to police that he had committed the robberies along with the defendant and Edward White.

Edward White testified on behalf of the defendant that he committed the robberies of Mr. and Mrs. Ghoston with Demarcus Jack and Jamon Ueal. Mr. White said it was his idea to break into the daycare facility and that he and Mr. Jack "ski masked up," which he described as putting a shirt over his face. He stated that they jumped the fence and entered the daycare facility through the open door. Inside, they first encountered Mrs. Ghoston, who was singing along to a gospel song playing on a nearby radio while she cleaned. They then encountered Mr. Ghoston, who immediately laid on the ground. Mr. White testified that he and the others searched the couple but did not find any money, saying, "We didn't get nothing but the wallet, the car keys and a little scrap[]er that he was scrap[]ing off the floor." Mr. White insisted that the defendant was not involved in the crime.

During cross-examination, Mr. White became confused when trying to identify Jamon Ueal and Demarcus Jack on the surveillance video. Mr. White admitted that despite having pleaded guilty to aggravated robbery in juvenile court, he had never attempted to exculpate the defendant.

The 19-year-old defendant testified that he had no involvement in the offenses and that he learned about the crimes from the television news. He said that after seeing the surveillance video played during the broadcast, he could not recognize anyone from the video but assumed that the perpetrators were Messrs. White, Ueal, and Jack "when they came in

-3-

telling . . . the sargeant that they did it." The defendant testified that following his arrest, he told Lieutenant White, "I saw three well known punk[s] rob the daycare."

During cross-examination, the defendant denied threatening to harm Mr. Ueal and Mr. Jack if they refused to testify on his behalf. Following this denial, the State played an audio recording of a telephone call placed by the defendant from the jail during which he tells another person to tell Mr. Ueal that there will be "real problems" if he refuses to testify for the defendant. The defendant nevertheless maintained that the statement was not truly a threat "because it never got back to him."

At the conclusion of the proof, the jury convicted the defendant as charged of the aggravated robberies of Mr. and Mrs. Ghoston. The trial court imposed concurrent Range I sentences of 8 years' incarceration. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal to this court.

In this appeal, the defendant contends that the evidence is insufficient to support his convictions because the State failed to prove his identity beyond a reasonable doubt. He insists that the certainty of the victims' identification of the defendant "is inconsistent with the circumstances of the crime" and that Mr. White's testimony that the defendant was not involved in the crimes "raises more than a reasonable doubt as to the essential fact element of identification." The State asserts that the evidence is sufficient.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated robbery is robbery as defined in §

-4-

39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1) (2006). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

The evidence adduced at trial established that three armed men entered the Premier Daycare through an open door, held Mr. and Mrs. Ghoston at gunpoint while demanding that they surrender their valuables, and left in possession of the victims' keys, cash, and credit cards. Both Mr. and Mrs. Ghoston identified the defendant as one of the three armed perpetrators in and out of court, and both were certain in their identifications. Jamon Ueal implicated the defendant in the offenses. This evidence is sufficient to support the convictions in this case.

Although both Mr. White and the defendant testified that the defendant was not involved in the crimes, the jury, as the arbiter of witness credibility, was free to reject this testimony. We must decline the defendant's invitation to go behind the jury's credibility determination to conclude that the surveillance video vitiated the victims' ability to identify the defendant. The jury saw and heard the video as well as the victims' testimony and chose to accredit that testimony. That was their prerogative.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-5-